So today we have the case of United States v. Pearson. I believe that Mr. Nelson, you're going first, so please proceed. Thank you. Good morning, your honors. May it please the court. Jay Nelson on behalf of Darnell Pearson. I will do my best to watch my own clock and I'll try to reserve about three minutes for rebuttal. Very well. Starting with our evidentiary challenges, your honors. I'm hoping to potentially streamline things a little bit of focusing on hearsay as to the challenges, starting with exhibits 31 and 32. It's our belief that fairly self-evidently those exhibits contained out-of-court statements offered for the truth of the matter asserted. We've given the court a number of citations where the exhibits were used in that by the district judge. And I won't go through every single citation, of course, because there are a number. But I'd like to just highlight ER 714 on the cross. Counsel, with respect, could I ask this question? Let's say that the court agrees with you that exhibits 31 and 32 are inadmissible hearsay. Given the error in admitting those exhibits harmless. Thank you, your honor. I appreciate that. So I think here's my answer on prejudice. I think at the outset it's important to frame this case as an unusual case for a federal drug prosecution, my experience. This was a reactive investigation in response to defense at all deaths. So the federal government picked this case up from local authorities, which happens, of course, sometimes. But what happened in this case is that it didn't have any of the bells and whistles we typically see in a federal drug prosecution, especially if it's a proactive one. So there's no confession. There's no, excuse me, your honor, that's fine. Excuse me. Counsel, from time to time, your voice is fading in and out. So to the degree you can get closer to a microphone or turn it up, it might be helpful to the panel. Let me try to stand a little closer to the computer, if that helps. Is this a little bit better, your honor? That's better for me anyway. Okay. So as I was saying, a lot of features of a typical drug prosecution were missing here. There's no confession. There was no cocaine or fentanyl found on Mr. Pearson. There's no control by, there's no surveillance, there's no wiretaps, there's no cooperators, there's no body wires, none of that stuff. But we have- But how does that really matter? Because was there any real doubt in terms of at least the episode that Judge Smith raised involving Ms. Carter, that he was the source? Yes, absolutely, your honor. What's the doubt? Mr. Pearson took the stand and he testified at length as to what was actually happening in those tests. And his characterization was contested by the government. It was based on the government's expert testimony through Detective Cardinal. But Mr. Pearson took the stand and he testified under oath as to what was happening in his relationship. This was his 20-year relationship with a person. And they had their own way of talking. They had their own history. They had 20 years of baggage, 20 years of joys, 20 years of pain, 20 years of experience with each other. And they had a way that they talked with each other. And it involved some kind of insults and some, and it dragged into their communication the way they talked, incorporated their baggage. And he explained what that meant for him. And I got to say, your honor, I have, I've known my wife for a little over 20 years as well. And if the court were to look at 4,000 text messages between me and my wife, I think you'd have a hard time understanding what we were talking about as well. So Mr. Pearson took the stand and he gave a plausible explanation for what happened. And then the government had a plausible explanation for what happened too. And by definition, when you have two plausible explanations for what happened, that's a close case. It is at least, it's at least a forum where at least one juror could have had a reasonable doubt and looked at Mr. Pearson and said, you know what, I'm not at any, really believe him, but it's reasonable. And I have a reasonable doubt. And on that basis alone, it could have been a difference. Plus the rest of it comes into play and how they could have shifted that balance because what happened ultimately on count one and count two was credibility battle. Count one was Ruiz versus Mr. Pearson. Count two was Mr. Pearson versus basically the government's what these text messages meant. So Mr. Pearson's credibility, especially in the eyes of the jury, so what the government did was with the, with this, the government said, you know what, not only are we going to try to prove he's a drug dealer, but we're going to try to prove that he's a drug dealer who manipulated his own girlfriend with drugs for sexual and cleaning and other things. And count two specifically took it to level three, which was, he not only manipulated her, he actually deliberately caused her drug addiction, the drug addiction that ruined her life so that he could manipulate her for low level. My position. Well, that's a lot more complicated than the question I'm trying to pose, which is what's the alternative theory for where the fentanyl came from? Well, defense counsel presented a couple of different theories and didn't necessarily commit to one, but I guess in the court, I assume in the sense of presenting the jurors with a reasonable doubt, one was that Ruiz and Carter described the fentanyl experience differently. So one thing, just one thing the defense counsel told the jury was maybe it wasn't even the same substance. Maybe it didn't even come from the same person because Ruiz described it as not really having any flavor or taste whatsoever. Whereas as we know from the text message, Ms. Carter said it tasted like Norco. So one of the things the defense counsel said was maybe this wasn't even the same substance. It didn't even have the same source. So that would have been a sort of mysterious, we don't know, which is kind of what this case was. I mean, it was basically a gun. The other alternative that defense counsel gave the jury was that Mr. Carter or excuse me, Mr. Pearson wasn't the only common denominator between the two counts. Ruiz was also, he had a relationship with Carter. They interacted together at the place, but Ms. Carter came to visit Mr. Pearson quite a bit. And so the defense counsel also suggested that there was some kind of relationship there, that he could have been the source. And she pointed out the bias and the motivation that somebody in Ruiz's situation would have had to deflect attention elsewhere. And that's a critical point, because he did it. I mean, he admittedly gave this drug to his friend and killed one of them and almost killed another one and almost killed himself. That's a terrible circumstance. I feel horrible for all three of them, of course. But when you are somebody in Ruiz's situation, you know, a lot of people would kind of look, regardless of the morality and ethics of that, would kind of look around and think, geez, I got to get this attention somewhere else. And so defense counsel based on points of the jury, did you know what maybe it was Ruiz? Counsel, let me, again, we're having trouble hearing, at least I'm having trouble hearing you. Let's just say an arguendo that Ms. Carter's texts were hearsay. You're not contending that Mr. Pearson's texts are hearsay, are you? Well, typically the defendant's personal statements fall under the statement of a party. Right. So we got his statements. We got Ruiz's what was going on, his telling him and telling the police that he got the drugs from Mr. Pearson and where he lived. And at that point, there's certainly an environment that would potentially affect the jury's way of, if you will, analyzing the source of the drugs, as my colleague pointed out. I know you said that he talked about possible alternatives, but wouldn't a reasonable juror have had any, would they have had any problem tying your client to the drug? Where else could they have come from in this situation? Well, there was evidence that Ruiz partied a lot, including with cocaine, that even he admitted he didn't get from Mr. Pearson. So Ruiz had other sources of cocaine, and he easily could have gotten it from somebody else. And the same was true for Ms. Carter. There was evidence that she had a drug addiction. Those are the facts, but that doesn't really address the legal issue, which is, number one, is this even hearsay? I mean, these are text messages that are res gestae of the offense. The defendant was moving cocaine from wherever he had it to his girlfriend's house, and they were setting up the delivery, and he's charged with doing that and causing death. So it seems to me that, number one, it's not hearsay. Number two, if it is, it's hearsay of the girlfriend only. And if that's true, then the judge properly ruled it, under the catch-all exception, is admissible to let the jury know what happened in the conversations. I just don't see an issue here, legally. John, are you referring to Exhibits 31 and 32? Exactly. Oh, but see, those messages occurred out of context about two months before. So those were two months before the events of the case, and they were offered as 404B evidence to show a prior post-contact. Okay. Correct. So in terms of direct evidence that what was happening on January 7th was the delivery of cocaine that accidentally turned out to be fentanyl, it was framed in terms of 404B. It wasn't framed in terms of direct proof. Okay. All right. Very good. So speaking to Judge Smith and Judge Clifton to the prejudice piece, the devastating effect of this is that we have very, very distasteful conduct alleged. And I want to see, if you look at these allegations, you say, wow, he took the mother of his own children and deliberately got her addicted to cocaine so he could manipulate her for sexual behaviors. If he's going to do that, why wouldn't he take the stand and lie to me to save his own skin? It's devastating when basically the whole case did come down to credibility. Mr. Pearson's version of events versus the government's version of events. And without the bells and whistles of confession or any cocaine or fentanyl found on him or any surveillance or any of the stuff that is usually used in federal cases to really pin it on the guy, this is a he said, she said. And Mr. Pearson's credibility took a massive hit, coupled with Exhibit 12, which made him an impossible guy in the exact same way as 31 and 32, as well as the boost on the other side that Ruiz got from what we are saying was hearsay on his side. And so that's, in a nutshell, the president's analysis. Before you get down to the time you wanted to preserve, I would like to pose a question with regard to restitution. Yes. And that is that the pre sentencing report stated that the MVRA applied to this. Was there any objection stated to that by defense counsel at trial? So how can how can we say that the air was clear and obvious if there was no objection to the statement made by the resentencing report? Well, certainly that's the nature of plenary honor is that even if defense counsel doesn't make an objection, it's obvious under the plain language of the statute that it doesn't apply to Pearson's offense of conviction. It was just an absolute defense counsel didn't pick up on it. The probation officer preparing the report didn't pick up on it. How is it we expect the district court to have figured it out itself without any comment from the people who should know even better? Well, the MVRA says it gives a list of statutes of offenses that apply. Sure, it does. We know that. But that doesn't tell us anything that defense counsel shouldn't have known or the probation officer shouldn't have known. The fact the statute says something doesn't automatically convert to come to plain error. If it did, their analysis would be very different from the way it is. So why is this such a plain error? Well, it doesn't even require statutory interpretation. It's just literally the statute lists a number of offenses, and it's either in there or it's not. And I think that certainly that's rises to the level of plenary. Also, I would refer to a case called United States versus Montgomery, which helped plain error in a very related circumstance. I regret that I didn't cite it in the briefs. I'll give you a brief citation right now. 384 F3rd 1050. Pin site is 1064, the 9th Circuit case from 2004. It found plain error under a very similar circumstance in this, and I would urge the court to follow that, as well as the other cases we've cited, including the remedial case of Jenkins, who was requesting a full re-sentencing. And with that, if I could reserve the balance of my time. Yeah, of course. All right, Mr. Tierney, let's hear from you. Thank you. Good morning, members of the panel, and may it please the court. I'm Mike Tierney. I'm an assistant U.S. attorney, and I represent the United States. As a side note, Your Honors, I was an Army officer for a few years at the beginning of my career. I'm going to break out my parade ground voice for this argument, given the volume issues. If it's too much for the court, just let me know, and I'll dial it on back to a normal speaking voice. At least for my part, we can hear you loud and clear. I think your colleagues, maybe the microphone is not working well because it's kind of crackling and so on, but I can hear you just fine. Thank you, Judge. In this case, the trial court properly admitted several items of evidence after weighing their full context in trial, and we'd urge this court to affirm. I'd like to begin with the issue that you, Judge Smith, first posed and then Judge Clifton, I believe, picked up on it subsequently, and that is harmless error. Of course, we argue that there was no error in admitting those two challenged text messages, but we certainly also argue that even if there was error, it was harmless. It's not more likely than not that this affected the verdict. We can see that because of the other text messages, and I think that's how you posed the question, Judge Smith. For example, the two challenged text messages are the victim, Ms. Carter, talking to the defendant and saying, you got me hooked on drugs, essentially just so that you could get sex. Well, there are other text messages like in Exhibit 29, which appears at 2 ER 158 of the record, where the defendant, his own words, give basically the same impression, that it's transactional, how Lisa Carter asks for drugs and how the defendant bargains or gives her the context that he gives her the drugs in. In that Exhibit 29, he says, WTF world you live in. I just gave you a .8, which other testimony indicated was cocaine, for nothing. Oh, my bad for cleaning and sweeping up my house and cooking some shrimp for me. I can't afford to give you all my expletive deleted just so you can get high. And there's another text If you was a real female, you'd have been over here with me snorting cocaine off of a real racial epithet deleted penis and drinking something. So the other text messages, the government offered all of these text messages and other drug related text messages between the defendant and Lisa Carter, as well as other drug evidence under 404 B that had nothing to do with these text messages all at a time. And so when the judge is admitting these, he's not admitting just 31 and 32 in isolation. He's admitting them in the context of all the evidence at the trial. So that's one signal, one clear signal that 31 and 32 themselves are harmless, even if there was any error. Because let me ask you this. What I'm troubled about here on Exhibits 31 and 32, they're being admitted to contact for the texts that are sent days later. And under United States versus Gadsden, with which you're familiar, it suggests to me that that kind of a statement has to be used in contact with a statement in the same conversation. Isn't that correct? Two, two responses, Your Honor. First of all, I think that's the correct reasoning of Gadsden. But there were two theories under which the government explains that the prior text messages, including 31 and 32, were not hearsay. One is what Gadsden talks about, and that's context of the conversation. The other one was that they were offered to show the state of mind of the defendant when he's texting with her on the night before the offense and the night of the offense. On the context piece of things, our reasoning is that it's artificial to place limits on this type of conversation, the conversation that the defendant and Lisa Carter were engaged in, because it was a non-ending text message that seemed, from all review of the evidence, to sort of echo itself as time went on. The things that he had said to her, sometimes months beforehand, came back and could be relevant and could tell the jury what they meant on June 6th and 7th. So for example— Let's just say hypothetically, arguendo, that I'm having trouble with the idea that this is not hearsay, but what is the government's argument that this is all harmless? Exhibit 31 and 32. Best argument relies on the context of the evidence as a whole. So we start with the other drugged text messages. The purpose that the government offered 31 and 32 for was part of a package of evidence that was 404B evidence. So the key question looks at the texts on the night before the offense and the night of the offense. Lisa Carter asks for a dub, and she offers him food, and they agree to a sexual encounter. And then the night of the offense, he asks, how is it? She says, it's okay, it tastes like a Norco. What does that mean? The defendant said that was all about a shrimp burrito. And the government said that is bargaining for drugs in the case. So 31 and 32 helped show that that was drug bargaining, but there were plenty of other text messages that got that same idea across. Even if you take 31 and 32 out, you're still left with the exact same words of the defendant that show that that was drug bargaining. You're also left with all the other 404B evidence in the case, including the fact that he had razors sitting next to baggies at his apartment, including the fact that another woman who was a good friend of Lisa Carter also bought cocaine from the defendant using the same dub terminology. And so we keep expanding things. Other drug text messages show they're harmless. Other 404B evidence shows that those two are harmless. And then the rest of the evidence in the case as a whole. And chiefly, or not chiefly, but very importantly, and we mentioned this to the jury a couple of times, these were the first two overdose deaths in Fresno County and Madera County. The defendant is right there when the drugs are being given to Adrian Ruiz. We know that from his cell phone location data. He's right there when Lisa Carter is overdosing. He's a neighbor and a previous cocaine source of Adrian Ruiz. He's the boyfriend and the mother of Lisa Carter's children. So there's powerful evidence that has nothing to do with the 404B evidence, with the drug evidence, with those drug texts. As you know, Mr. Nelson has indicated that the government, without 31 and 32, there's little evidence that directly ties Mr. Pearson to giving the fentanyl to Ms. Carter. What's the government's best argument that that is incorrect? I think you just gave a little bit of it just now, but what is your best argument that evidence besides the alleged hearsay was sufficient to tie Mr. Pearson to the giving of fentanyl to Ms. Carter? Right. Okay, Your Honor. So the first piece of that is the GPS phone data and the messages themselves that indicate he's right there. Right after that text message that Lisa Carter sends that says it tastes like a narco, she dies and there are no more text messages. The defendant's right in that location. Even right there, that's a strong implication that he had something to do with it, and that's without considering any other prior drug evidence. Did the defense object to the introduction of the GPS evidence? No. Okay. All right. So we start with, you know, undoubted technical data that puts him at both scenes of both crimes in a very unusual fashion. We also had testimony that indicated, listen, in the drug world, you don't make a drug deal with people that you don't know. The dealers and the recipients, the buyers, have close relationships. They have to have some level of trust. Well, evidence that links both Adrian Ruiz to the defendant and Lisa Carter to the defendant in that respect. We have the other 404B evidence that I just touched on, which is Megan Gonzalez, the witness who had also bought cocaine from the defendant using the same terminology, and the evidence from the search warrant. We also had the consciousness of guilt evidence. And of course, you know, there's different positions back and forth on that. But after the overdoses, the defendant approached one of the victims and explicitly made the link, at least in our view, between the overdose that affected the three in Fresno and Lisa Carter. He said to Mr. Mark Banuelos, who was one of the victims in Fresno, who the defendant basically didn't know at all. He walked up to him. He said, I'm sorry that this happened. My baby mama essentially died the same way. She had a baggie in her hand. And Mark Banuelos testified that it looked to him like the defendant was apologizing. And they had no prior relationship that would lead him, the defendant, to come and apologize or to invoke the overdose by Lisa Carter. So we've got consciousness of guilt. We have GPS and phone data. And we have a lot of other 404B evidence. Thank you. And Your Honor, then I'd also like to just respond or talk a little bit about, I think this was Judge Murphy's point, and it also was included in what you just asked me, why these texts between Lisa Carter and the defendant may or may not have been hearsay. I talked about context for a second. Then our second argument is that they weren't offered for the truth of the matter asserted. They're offered to show what the defendant thinks on the night of January 6th and January 7th. Does he think that Lisa Carter is only talking about asking him for cocaine? And does he then know that she's talking about cocaine and intend to distribute what they think is cocaine on January 7th? So you don't have to believe her accusations in order to make the inference that somebody who has heard from a person, hey, I think you're the defendant in this case, knows exactly what she's talking about. And this is particularly the case because the defendant testified on direct that he had nothing to do with drugs. He said at 4 ER 696, she was basically getting high and she couldn't get up and go perform her job duties. And I kept begging her and begging her and begging her. I cried about it. I mean, come on. Once that, you know, especially once that testimony is in, you know, what the defendant knows and believes about Lisa Carter and drugs and, you know, what their history is and their bargaining history comes in to impeach him and for the non hearsay purpose of showing his state of mind on January 6th and 7th. All right. So unless the panel has any other questions. Just a quick, quick question in response to that. What portion of the trial were 31 and 32 received in by the district judge? Yes. Good question, Your Honor. They were received in the government's case in chief because remember in our case in chief, there's already the texts from January 6th and 7th, which is give me a job, please. This is Lisa Carter asking the he says, and then she offers him food and then they arrange for sex. And then on January 7th, there's discussion about a powdery substance and Norco. So the government's already got approved what that means. So they were admissible and admitted in the government's case in chief. I'm simply making the point that when you consider everything in the context of the trial as a whole, there's lots of reasons to see why those things were not hearsay. The defendant's testimony sharpened up why they weren't hearsay, but they were already non-hearsay. Let me just ask you, this is not a big deal, but what was exhibit 12? This is the photograph of Mr. Pearson on the steps. What was that probity above? That was the link between the drug evidence that was found in Mr. Pearson's apartment, the razor blades that were sitting next to baggies on the counter and Mr. Pearson himself. So there were a couple of links there. First, the detective who found the things testified that the defendant was the only one who was in the apartment and he made an in-court identification of the defendant. And he went there because of Ruiz. Ruiz told him that that's where the person lived who gave him the drugs. Is that right? Exactly, your honor. And he said that on a previous occasion and I think on this occasion too, the defendant had given him individually bagged amount of what they thought was cocaine. So discovering sandwich bags and a razor blade on his kitchen counter was important. And that's exactly what we said at closing, why that evidence was important. And I see that my time is up, your honor. I've got maybe just a few seconds to close up that link if the court will grant me the indulgence. Okay. And the government didn't just stop there with linking the defendant to that evidence. So there's in-court identification. There's the photograph that shores up that linkage. And when the defendant testified, we asked him, well, those were your baggies, right? And that was your razor, right? So all of those, you might say maybe this is a belt and suspender and another belt on top of it method of linking him to that argument. But that was important evidence that we mentioned in closing and rebuttal. And so there were several ways to tie him to that evidence. Okay. Do either of my colleagues have additional questions for Mr. Tierney? All right. Thank you, Mr. Tierney. Mr. Nelson, I think you have a little bit of time left. You please go ahead. Thank you. I think government counsel's analysis of the remainder of the evidence demonstrates why they introduced 31 and 32 and why 31 and 32 are so prejudicial. The rest of that evidence is not strong, Your Honors. The consciousness of guilt evidence is Mr. Pearson walking up to a man who almost died and saying, I'm glad you didn't die. That's not consciousness of guilt. That's basic human decency. You know, Gonzalez testified about previously buying drugs from Mr. Pearson. She had no personal knowledge about what happened on January 2nd. The cell site data was undisputed. And it's not unusual. Mr. Tierney used the word either at his house or at the home where his girlfriend lived. Nothing about that is unusual. And, you know, there was this business about saying the words China white, which was really like unusual circumstances for the government to elicit that from Ruiz, which involved recalling him and refreshing his memory about it and all this kind of stuff. When you have all that, you see why the government wanted 31 and 32, because it didn't feel confident about its case. And it was, it mounted a character attack against Darnell Pearson, because that behavior, if it's true, which it's not, but if a juror believed it's true, is exceptionally ugly. And it's exactly the kind of person who would do that, who would lie about shrimp burritos and whatever else. But otherwise, his version of events was reasonable, reasonable enough to generate a reasonable doubt in the mind of a rational juror. Okay, your time is up. But let me ask my colleagues whether either has additional questions for Mr. Nelson. All right, very well. Thanks to both counsel for your argument. The case just argued United States versus Pearson is submitted and the court stands adjourned for the day. Thank you both. Thank you, Your Honor. This court for this session stands adjourned.
judges: CLIFTON, SMITH, Murphy